BEFORE THE SECOND DIVISION, MAY 3, 1943

**No. 48246.**—Protest 32339–K of Hans J. Mayer (New York).

TILSON, Judge: This suit involves the question of the tariff status of certain seed-cleaning machines. Duty was levied thereon at the rate of 27½ percent ad valorem under paragraph 372, Tariff Act of 1930, as machines not specially provided for. It is claimed that said machines are properly entitled to free entry under paragraph 1604 of said act as agricultural implements.

The dimensions of the machines are given in illustrative exhibit A as 8 feet 8 inches high, 8 feet 4 inches wide, and 6 feet 8 inches deep. As there depicted, two belt drives are shown, which would seem to indicate that the machines are power-driven, although that circumstance is not elsewhere affirmatively established as a fact.

The sole function of the mechanism is to clean clover seed, that is, to get it by itself in a clean condition. It appears that, when removed from the field where grown, clover seed is mingled with weed seed and other extraneous matter. This mass is first mixed with given quantities of iron powder or filings and water. When it reaches the magnetized drum in the machine, there adheres thereto only that portion of the mixture which has attached thereto the iron powder or filings. The latter does not become attached to the very smooth surface of the clover seed, but does adhere to the rough surface of the weed seed and other extraneous matter. Therefore, the clover seed, being free of such matter, passes over the drum and leaves the machine by itself in a clean condition.

The present two machines are the only ones of this particular kind in the United States, one being located in the plant of the G. L. F. (Grange League Federation) Mills in Buffalo, N. Y., and the other in the plant of its subsidiary, Allied Seed Co., in Fort Wayne, Ind.

The said mills "manufacture feed, and clean and process seed for use by the dairymen and poultrymen, the farmer," the instant machines being "used primarily to clean out dodder and buckhorn" from clover seed. The business is conducted by a co-operative with a membership of 140,000 farmers. The uncleaned seeds are purchased from members and nonmembers, depending upon the price, and when cleaned are sold to farmers through distributing stores and

agents of the co-operative, a rebate in price being allowed members. We quote from the testimony:

Judge KEEFE: In other words, scattered throughout this territory you have what is known as a local cooperative that deals in seeds, and lumber perhaps, and coal, and all those things, and that local cooperative is composed of farmers. It is a local organization, and you distribute to them and give them a lower price by the division of profit.

The WITNESS: That is right.

Singularly, the same witness stated that "usually the G. L. F. members are not in seed growing areas."

There is no proof that these machines are ever operated by farmers on farms. One of the witnesses said that he has seen them in operation in Buffalo and in Fort Wayne. Hence, it is fair to assume that they are not located on farms.

The law in the premises seems to be well settled that such machines when used as they are here employed are not agricultural implements within the tariff meaning of that term.

In *Mangelsdorf Seed Co.* v. *United States*, Abstract 44461, 40 Treas. Dec. 441, the merchandise involved was thus described by the local appraiser:

Gear drive cylinders 24" diameter, 8 feet in length, ready for attachment to the driving machinery, located on the premises. They are used almost exclusively by wholesale seed houses and on account of their being cumbersome and heavy are almost impracticable for use on a farm.

In our decision we said:

This statement of the appraiser is fully corroborated by the testimony of the importer's witness who concedes that the machine in question is used exclusively by large dealers in seeds, in their seed stores in cities, solely for cleaning seed and removing therefrom all extraneous matter including weed seed.

Inasmuch, therefore, as they are never employed by farmers on farms in connection with any agricultural operation, the machines are not classifiable for tariff purposes as agricultural implements under paragraph 391 of the act of 1913, as claimed by the importers.

A similar conclusion was reached in *Eddey Bellefleur* v. *United States*, Abstract 44462, 40 Treas. Dec. 441, where the involved machine was used to crush oats for cattle feed. There, as here, the evidence failed to show that the machine was used by farmers on farms. Rather it disclosed that the device was part of a country mill to which, as a commercial proposition, oats and similar crops were sent to be ground into cattle feed. In overruling the claim for free entry as agricultural implements we said:

To hold milling machinery to be free as agricultural implements, simply because the work performed thereby produces a commodity used by farmers, would make the millers co-beneficiaries with the farmers in the legislation. That was not the evident intention of Congress.

In distinguishing such machines from the ensilage cutters involved in *Tower* v. *United States*, 9 Ct. Cust. Appls. 307, T. D. 38239, we thus quoted from the decision of the appellate court therein:

* * * it seems clear that an implement used exclusively for the purpose of cutting corn raised on the farm and storing the product to be fed on the same farm to cattle raised or kept on the same farm, is an instrument employed in supplying sustenance to cattle and, in even a very narrow sense, is used as an agricultural implement.

Similarly, if it were here shown that the imported machines were used by farmers on their farms to clean seed for planting on such farms, unquestionably the machines if so chiefly used would be agricultural implements within all the prevailing decisions on that subject. But it has been consistently held that where the implement is employed away from the farm and not operated by farmers that

it was not an agricultural implement in the tariff sense, even though the product of the machine may be used by farmers. For instance, concerning the seed-cleaning machine the subject of *Northrup, King & Co.* v. *United States*, Abstract 23784, 63 Treas. Dec. 1459, we said:

According to the testimony the imported merchandise consists of a seed-cleaning machine installed after importation on the third floor of the plaintiffs' plant for the sole purpose of separating alsike clover seed from timothy seed. The product of this machine is used by farmers exclusively The individual farmer is not in a position to purchase this machine as he does not produce a sufficient quantity of seed himself to warrant it. Farmers do not use the machine.

Hence it was denied free entry as an agricultural implement.

To the same effect is our ruling in *D. D. Hill* v. *United States*, Abstract 23400, 63 Treas. Dec. 1370, involving a certain grain-cleaning machine.

Therefore, on the established facts and the law applicable thereto, as enunciated in the above decisions and others of like tenor, we hold the present seed-cleaning machines to be properly dutiable at the rate of 27½ percent ad valorem under said paragraph 372 as machines not specially provided for, as classified by the collector. All claims are overruled and judgment will be rendered accordingly.